UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PENNY AND MARK SMITH, ET AL                    CIVIL ACTION

VERSUS                                         NO. 05-6648

TANGIPAHOA PARISH SCHOOL BOARD,                SECTION "C" (4)
ET AL

## ORDER & REASONS[1]

Before the Court are (1) a Motion for Summary Judgment by Defendants Tangipahoa

Parish School Board ("TPSB"); Louis Joseph ("Joseph"), the Superintendent of the Tangipahoa

School District; Deborah Browning ("Browning"), Principal of Loranger Elementary School in

the Tangipahoa School District; and Renee Durio ("Durio"), an employee of TPSB (hereafter

collectively referred to as "Defendants"); (2) a Motion for Summary Judgment by Defendant

Janice Fairburn ("Fairburn"); and (3) a Motion for Rule 11 Sanctions by Defendants.   Having

considered the motions, response briefs, and applicable law, the Court GRANTS Defendants'

Motion for Summary Judgment, GRANTS Fairburn's Motion for Summary Judgment, and

DISMISSES as premature the Motion for Rule 11 Sanctions for the reasons that follow.

### I.  PROCEDURAL HISTORY

Mark and Penny Smith ("Plaintiffs"), individually and on behalf of their minor children

C.R.S., C.S., and J.S., initiated this lawsuit on December 21, 2005 against Defendants and

Fairburn.  Plaintiffs brought suit for damages and injunctive relief under Title II of the

---

[1] Mary A. Barket, a third year law student at Tulane Law School, assisted in the research and preparation of this Order and Reasons.

Americans with Disability Act, 42 U.S.C. § 12132 ("ADA"), Section 504 ("504") of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act") and 42 U.S.C. § 1985

alleging the following:

> (1) that Defendants had failed to provide reasonable accommodations for C.R.S.'s
>
>   disabilities;
>
> (2) that Defendants had attempted to deprive C.R.S. of the benefit of a public education
>
>   by reason of her disability;
>
> (3) that Defendants engaged in retaliatory acts against all Plaintiffs for asserting C.R.S.'s
>
>   rights under the ADA and the Rehabilitation Act; and
>
> (4) that Defendants conspired with Fairburn to deprive Plaintiffs of their Civil Rights,
>
>   including their rights under the ADA and the Rehabilitation Act, their right to free
>
>   speech, and their right to due process.[2]

Plaintiffs also brought state-law claims for intentional and/or negligent infliction of emotional

distress and invasion of privacy. (Rec. Docs. 1 & 50).

---

[2] Plaintiff's complaint raised the possibility that they were also seeking redress under the Individuals with Disabilities in Education Act ("IDEA") and the Federal Educational Right to Privacy Act ("FERPA"). Upon further clarification, however, Plaintiffs stated that the statutes were mentioned only in passing and that they did not plan on pursuing claims under these statutes. (Rec. Doc. 50). To the extent that it might be necessary, this Court has satisfied itself that IDEA is inapplicable as C.R.S. does not have a learning disability requiring special education and Plaintiffs are not seeking special education. As such, Plaintiffs need not have exhausted the administrative remedies required by IDEA in order to maintain the current lawsuit. *See Babicz v. School Board of Broward County*, 135 F.3d 1420 (11th Cir. 1998)(finding exhaustion requirement a required inquiry regardless of whether Plaintiffs' directly raised the issue); *Frazier v. Fairhaven School Committee*, 276 F.3d 52, 59 (1st Cir. 2002); *Rhodes v. Ohio High School Athletic Ass'n.*, 939 F.Supp. 584 (N.D. Ohio, 1996).

In their Motion for Summary Judgment, Defendants argue that C.R.S. is not disabled as a matter of fact or law, that even if she is disabled, they are providing reasonable accommodations because they are doing everything her doctors recommend as medically reasonable, and that they have not retaliated against Plaintiffs by inciting members of the community – including or with the help of Fairburn – to verbally or otherwise attack Plaintiffs. (Rec. Doc. 23).

Fairburn also argues in her motion that C.R.S. is not disabled as a matter of fact or law. Unlike Defendants' motion, however, Fairburn also argues that Plaintiffs have failed to establish the existence of a conspiracy. Fairburn acknowledges that she alone was responsible for the flyer, but that the flyer does not give rise to a false light invasion of privacy claim because it does not contain any false or misleading information.

## II.  BACKGROUND

Most of the background facts in this matter are undisputed. Penny and Mark Smith are the natural parents of J.S., C.S., and C.R.S. (born in October of 1996). Plaintiffs moved to Loranger, Louisiana in 1998, at which time or shortly thereafter, J.S. and C.S. Smith began attending Loranger public schools in the Tangipahoa School District. J.S. currently attends Loranger High School and C.S. currently attends Loranger Middle School. When C.S. started at Loranger Elementary School, he required and received special education, including the assistance of a speech therapist. Plaintiffs withdrew C.S. from speech therapy in February of 2001, after a dispute over which speech therapist would work with C.S. arose between Plaintiffs and school officials including Browning, who was and continues to be principal of Loranger Elementary School, and Fairburn, who worked at Loranger Elementary School until retiring in November of 2003. (Rec. Doc. 46, Exhs. C & D).

Before C.R.S. was enrolled at Loranger Elementary School, she was diagnosed with allergies while on vacation with her family in 2001, when she came into contact with a horse, had an allergic reaction, and was taken to the emergency room. (Rec. Docs. 38 & 39, Exhs. C & D).  When Plaintiffs subsequently enrolled C.R.S. at Loranger Elementary School, they informed the school that C.R.S. had a severe horse allergy and requested that C.R.S. have an EpiPen available in the nurse's office and a designated seat on the school bus to avoid exposure to students who may have been in contact with horses. (Rec. Doc. 23, Exh. A).  Defendants complied with both of these requests and made similar accommodations for both the 2003-2004 and 2004-2005 school years. (Rec. Doc. 23, Exh. A).

In August of 2003, Dr. David L. Schneider and Nurse-Practitioner Jodi Buras began treating C.R.S. for allergies.  In order to diagnose and properly treat her allergies, Dr. Schneider performed a prick test and an inhalant skin test on C.R.S. and determined that C.R.S. had allergies to horses, three types of mold, two types of dust mites, and dogs.  (Rec. Docs. 38 & 39, Exh. B, pp. 14 & 17).  According to Dr. Schneider, her most significant reaction was in response to horses, though she also had "large reactions" to two types of mold and two types of dust mites. (*Id.,* at 17).   As treatment, C.R.S. was prescribed Albuterol, told to take an antihistamine, and told to carry an EpiPen Jr. (*Id.,* at 18, 30).  In 2004, Dr. Schneider began administering allergy shots to C.R.S.. (*Id.*, at 30).  After Dr. Schneider administered the first allergy shot to C.R.S. on January 16, she had a reaction involving an "itchy, welty rash" which "might indicate … a mild anaphylactic reaction." (*Id.*, at 27).  After this reaction, Dr. Schneider remixed her kit and stated that C.R.S. did not appear to have a problem with her treatment. (*Id.,* at 26-27).

Apparently in response to two particular incidents – one in which a library display used horse equipment and the other occurring during Kid's Week when a horse was brought onto campus—Plaintiffs engaged an educational advocate in February of 2005 in order to represent

them in getting accommodations for C.R.S. (Rec. Doc. 23, Exh. C). Plaintiffs formally requested accommodations under Section 504 of the Rehabilitation Act ("504 accommodations") on March 1, 2005.  (*Id.*).  Shortly thereafter, on March 4, Browning sent a notice to Joseph and Plaintiffs indicating that she had received the request for 504 accommodations, that she and the vice-principal had intended to ride horses to school on March 24 as part of an incentive program for students, and that accommodations would be made for C.R.S. on this day.  (Rec. Doc. 1, Exh. A).  On March 7, Browning informed all parents of second, third, and fourth grade students at Loranger Elementary School, of the upcoming LEAP testing week and of her and the vice-principal's plan to ride horses to school if attendance rates during this period reached 98%. (Rec. Doc. 1, Exh. B).  On March 11, Browning sent a letter to Plaintiffs offering limited accommodations for C.R.S. on March 24. (Rec. Doc. 1, Exh. A).  The letter also requested that Plaintiffs send a written response to place their request for 504 accommodations on the next available appointment with the School Building Level Committee ("SBLC").  (*Id.*).  In response to this notice and in furtherance of their request for 504 accommodations, Plaintiffs sent a letter dated March 11 to Joseph, Durio, the 504 coordinator for TPSB, Browning, members of the Board of Elementary and Secondary Education ("BESE"), and the Louisiana Department of Education's Division of Special Populations, alleging discrimination and demanding investigation of the school's treatment of C.R.S. and the lack of available procedures to redress their grievances.  On March 14, Plaintiffs met with Joseph who requested a draft 504 accommodation plan, which Plaintiffs completed and returned on March 19.  (Rec. Doc. 23, Exh. D).  Plaintiffs also received and completed a Permission to Assess form from the SBLC chairperson.  Plaintiffs met with the SBLC on March 21, but were unable to resolve or work out a suitable 504 accommodation plan. (Rec. Doc. 23, Exh. F, p. 2).  A follow-up meeting was

scheduled for April 14, although Plaintiffs had requested a more expeditious meeting. (Rec. Doc. 23, Exh. A).

On March 22, 2005, Fairburn stood on the public highway adjacent to the Loranger Elementary school and distributed a flyer she had made to parents dropping their students off at the school. (Rec. Doc. 30, Exh. B).  In the flyer, she urged all parents to contact Browning and members of the school board and voice their support for Browning and the vice principal's decision to ride horses to school on March 24. (Rec. Doc. 30, Exh. A).  Although the flyer did not identify Plaintiffs or any of their children by name, the flyer stated that there was a child allergic to horse hair who threatened cancellation of the event and noted that "[t]his same parent caused our students to miss out on a beautifully decorated Library during Book Fair about 2 years ago, when the theme was western, and saddles, etc. had to be removed for ONE child." [3]

On March 23, 2005, Joseph communicated to Browning that she and the vice-principal were not to ride horses to school on March 24. (Rec. Doc. 1, Exh. A).  Browning sent a notice to Plaintiffs that same day, indicating that she believed it was necessary to inform Plaintiffs that "some students may be arriving at school … via horses/horse and wagons" on March 24. (Rec. Doc. 1, Exh. D).  Browning and the vice-principal did not ride horses to school on the March 24, but, because of the possibility that other persons would be riding horses to school, C.R.S. did not attend school on that day.[4]  On this same day, Mark Smith alleges that he was confronted in the parking lot of Loranger Elementary School by parents of other children attending Loranger Elementary School and was told to leave Loranger. (Rec. Doc. 1, p. 6).[5]

---

[3] There is no evidence as to how Fairburn learned of the ongoing dispute.
[4] According to Browning, the absence on March 24 was excused.
[5] Plaintiffs do not specify why Mr. Smith was at Loranger Elementary School, but Defendants present proof that he appeared to be at the school video-taping parents dropping their children off at school. (Rec. Doc. 46).

Plaintiffs and Defendants were able to work out a 504 accommodation plan in late March, which was eventually revised by the Plaintiffs in mid-April.  On April 16, 2005,  the Louisiana Department of Education, which had maintained an interest in the situation since Plaintiffs contacted them on March 11, sent a letter to Defendants indicating that "the [Local Educational Agency] may be in violation of 20 U.S.C. § 794 34 C.F.R. §§ 104.31 et seq. and/or other statutes, regulations, and requirements" and that Defendants "must correct the alleged violation or provide a written response explaining why the findings should not be finalized and reported to the State Board within 30 days of receipt of this letter."  (Rec. Doc. 1, Exh. A). There is no indication that Defendants sent a written response to the Louisiana Department of Education, but by April 28, the parties had reached agreement on both a 504 accommodation plan and a schedule for implementing that plan. (Rec. Doc. 23, Exh. J).

Pursuant to the completed 504 accommodation plan, Defendants provided the following accommodations:

> Sending a notice to all parents on May 2 stating that "one or more students at Loranger Elementary School" had a life-threatening allergy to horses and requesting that parents avoid bringing horses on campus, refrain from using horses or horse equipment as transportation to and from school, and ensure that their child's clothes and hands were clean and free from horse dander (Rec. Doc. 23, Exh. I);
> Holding a faculty meeting addressing Disability Harassment relating to FERPA, Awareness, Legal and Educational Responsibilities, Laws that Apply to Disability Harassment, and Retaliation  (*Id.*);
> Prohibiting horses and horse tack from being brought on campus;
> Training teachers and bus drivers to administer an EpiPen;
> Placing an EpiPen in the classroom, on the school bus, and in the office with the key accompanying C.R.S.;
> Initiating a walkie talkie protocol in which a walkie-talkie accompanied C.R.S. around campus;
> Giving the bus driver a cell phone programmed with relevant numbers so that she could summon medical help and alert her parents of an allergic reaction; and
> Washing down the public road if a horse passed down it so as to minimize the chance of C.R.S. having an allergic reaction.

On October 31, Plaintiffs allege that school officials admitted that a new substitute teacher was not trained on how to use an EpiPen, suggested that Plaintiffs drive C.R.S. to school instead of having her take the bus, and did not respond to Plaintiffs' inquiries regarding teacher training.  In response to these events, Plaintiffs filed suit against Defendants and Fairburn on December 21, 2005.

Despite Plaintiffs' lawsuit and certain logistical difficulties implementing some of the agreed upon provisions, Defendants appear to have continued to adhere to most of the terms of the agreed upon 504 accommodation plan.  Defendants ceased full compliance with the 504 accommodation plan in August of 2006 after the deposition of the allergist treating C.R.S., Dr. David L. Schneider, and his assistant, Jodi Buras, was taken on May 25. (Rec. Doc. 46, Exh. E). During the deposition, Dr. Schneider indicated that while C.R.S. had allergies which had the potential to be quite severe, her allergies did not require many of the accommodations Plaintiffs had requested and received as part of the 504 accommodation plan for C.R.S.  Specifically, Dr. Schneider stated that it was unnecessary and "impractical" to ban horses on campus, wash down the road after a horse passed upon it, and have administrators carry a cell phone or walkie-talkie for C.R.S. alone.  (Rec. Docs. 38 & 39, Exh. B).

In light of Dr. Schneider's statements and upon the advice of counsel, Defendants stopped washing the street down after a horse passed upon it, ended the walkie-talkie protocol, did not require the bus driver to carry a cell phone for emergencies involving C.R.S., did not send another notice to parents instructing them not to bring horses on campus, and put the EpiPen in the nurse's office. [6]  (Rec. Doc. 46, Exh. E).  Defendants continued to hold disability sensitivity training, keep an EpiPen on hand for C.R.S., train faculty and staff regarding

---

[6]Defendants argue that the provision regarding washing the carpool road became especially problematic after the Loranger Fire Department sent notice that it would not perform that task.  As a result of this notice, Browning and

anaphylaxis, and continued to notify Plaintiffs if "a field trip was to include horses, C.R.S.

seemed ill, the EpiPen had expired, etc."(*Id.*).

As set out above, Defendants and Fairburn then filed separate Motions for Summary

Judgment.  After these motions were filed, Plaintiffs discontinued treatment with Dr. Schneider

and had C.R.S. retested by Dr. James M. Kidd, an allergist in Baton Rouge. (Rec. Docs. 38 &

39, Exh. A).  Dr. Kidd performed allergy tests on C.R.S. on August 28 and issued a report on

September 5 confirming her allergies to horses, dust mites, and molds. (*Id.*).  In a note

discussing his recommendations and treatment, Dr. Kidd wrote that "environmental precautions

and medications … have provided good relief of her nasal allergy and asthmatic symptoms" but

that C.R.S. " will need to remain on an asthma treatment program indefinitely" and should

"avoid exposure to [horse and horse-related] allergens as well as possible." (*Id.*).  He further

stated that C.R.S. "has three factors in her workup that indicate a potential for a more severe

asthma and/or anaphylactic sensitivity" and that "[e]veryone associated with C.R.S. including

teache[r]s, coaches, tutors, instructors, friends, acquaintances, etc., should be aware that C.R.S.

is extremely sensitive to horses and that exposure could precipitate a life-threatening reaction."

(*Id.*).

On August 29 or 30, 2006, C.R.S. had an allergic reaction consisting of "watering

eyes" and a "scratchy throat" while at school. (Rec. Docs. 38 & 39, Exhs. A & C).  According

to Plaintiffs, C.R.S. was seated next to a child that had allegedly been in recent contact with a

horse.  (Rec. Docs. 38 & 39, Exh. C).  She was moved and her parents were informed of the

situation. (*Id.*).

---

the school custodians had used a pressure washer to wash down the street on at least one occasion. (Rec. Doc. 23,
Exh. O).

### III.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999).  A genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48 (1986); *see also Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001).  When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion."  *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."  *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).  In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations."  *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n.*, 497 U.S. 871, 871-73 (1990); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

### IV.  ANALYSIS

10

Both of their motions for summary judgment raise similar arguments regarding whether C.R.S. is "disabled" under the Rehabilitation Act and the ADA.  The Court begins its discussion with these common issues.

### A.  Section 504 of the Rehabilitation Act and Title II of the ADA

Although differences exist between Section 504 of the Rehabilitation Act and Title II of the ADA, the substance of these statutes in this case is sufficiently similar so as to permit a single analysis.[7]  *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193-94 (2002); *see also Pace v. Bogalusa City School Bd.*, 403 F.3d 272, 287- 88 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 416 (2005)(noting that the rights and remedies afforded to plaintiffs under Title II of the ADA and Section 504 of the Rehabilitation Act are nearly identical).  Both statutes seek to eliminate discrimination in various institutions by requiring covered entities to provide reasonable accommodations to a qualified individual with a disability and prohibiting covered entities from discriminating against the same.  *Pace,* 403 F.3d at 288.

Specifically, Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance… 29 U.S.C. § 794.

In almost identical language, Title II of the ADA states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Thus, in order to properly raise a claim under Title II of the ADA and Section 504 of the Rehabilitation Act, Plaintiffs must establish that (1) Defendants are a covered entity; (2) that

---

[7] The primary difference between the statutes lies in the applicability of each. *Pace*, 403 F.3d at 288 (*citing Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir. 2002)).  Section 504 applies to entities receiving federal financial

Plaintiffs are bringing suit on behalf of a qualified individual with a disability; and (3) that the Defendants have unlawfully discriminated against Plaintiffs on the basis of a disability. *Id.*; *see also Rhodes v. Ohio High School Athletic Ass'n.*, 939 F.Supp. 584, 588 (N.D. Ohio 1996).

In addition to having virtually identical requirements for bringing suit, the Rehabilitation Act expressly incorporates the anti-retaliation provision of Section 503 of the ADA. 29 U.S.C. § 794(d); 42 U.S.C. § 12203.  Thus, both statutes prohibit retaliation against any individual because he or she opposes any act or practice made unlawful by the acts. *Id.*  The scope of the protection afforded by this act extends to those who advocate on behalf of the disabled, including parents and teachers.  *See Weber v. Cranston School Comm.*, 212 F.3d 41, 49 (1st Cir. 2000)(noting that "disabled individuals may need assistance in vindicating their rights from individuals who may have their own claim to relief under the Act").  In addition, a plaintiff may maintain a retaliation claim, regardless of whether their underlying case is successful. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997).

### 1.       "Disability" under the ADA and the Rehabilitation Act

As a preliminary matter, a plaintiff must establish that he or she is disabled in order to maintain a cause of action under the ADA and the Rehabilitation Act. *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 316 (5th  Cir. 2001)(*citing Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)).  A person is "disabled" under the ADA and the Rehabilitation Act if they "have a physical or mental impairment that substantially limits one or more of the major life activities of such individual, if they have a record of such an impairment, or if they are regarded as having such an impairment." 42 U.S.C. § 12101(2); 29 U.S.C. § 705 (2002).  Accordingly, individuals who are not actually disabled but are nevertheless regarded as

---

assistance, while Title II of the ADA applies to public entities or private entities providing public accommodations.

disabled may still fall within the ambit of the ADA and the Rehabilitation Act. *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 489 (1999).[8]

(a) Substantial Limitation Requirement

A three part test determines if someone is disabled under the substantial limitation requirement. *Waldrip v. General Elec. Co*., 325 F.3d 652, 654 (5th Cir. 2003)(*citing Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)). A court must first decide whether the plaintiff has an "impairment," then whether the impairment affects a "major life activity," and finally whether its effects are "substantial." *Id.* A "physical impairment" of the type relevant to this case, is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genitor-urinary; hemic and lymphatic skin; and endocrine." 45 C.F.R. § 84.3(j)(2)(i) (2001); *see also Toyota,* 534 U.S. at 195. In this case, C.R.S. has a physical impairment. Allergies and asthma constitute physical impairments, *Heilweil v. Mount Sinai Hosp*., 32 F.3d 718, 723 (2d Cir 1994)("[a]sthma is a physiological disorder or condition that affects the respiratory system"), and no party disputes that C.R.S. suffers from allergies and asthma. (Rec. Doc. 46, p. 4).

---

[8] If an individual is not actually disabled but only has a history of a disability or is regarded as disabled, they may be unable to assert a claim based on a failure to accommodate. *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999)(finding "regarded as" plaintiffs are not entitled to reasonable accommodations); *see also Martinez v. Cole Sewell Corp.*, 233 F.Supp.2d 1097, 1132 (N.D. Iowa 2002). Instead, they are usually limited to claims based on the creation of a hostile environment and/or retaliation claims. *Martinez*, 233 F.Supp.2d at 1132 (finding that even though the plaintiff was not able to seek reasonable accommodations, there was "[n]othing in the applicable law … preclud[ing] Martinez from pursuing a claim of a hostile work environment based upon a 'record of disability' rather than an 'actual disability'").

In addition to establishing an impairment, however, Plaintiffs must show that this impairment limits a "major life activity" and that its effects are "substantial." 42 U.S.C. § 12102(2); *Waldrip*, 325 F.3d at 631.  Examples of major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  45 C.F.R. § 84.3(j)(2)(ii).  Plaintiffs allege that C.R.S.'s allergies affect the major life activities of breathing and learning.  While breathing and learning are major life activities and allergies and asthma affect such activities, Defendants strongly contest the notion that C.R.S.'s allergies "substantially" affect her ability to breathe or learn.

An individual is "substantially limited" if he or she is:

(1)      unable to perform a major life activity that the average person and the general population can perform; or

(2)      significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. 29 C.F.R. § 1630.2(i).

According to the Supreme Court, this definition should be interpreted "strictly to create a demanding standard for qualifying as disabled." *Toyota,* 534 U.S. at 197.  Thus, the impairment must "prevent or severely restrict" an individual's ability to engage in a major life activity, which "clearly precludes impairments that interfere in only a minor way" with performance of such an activity. *Id.*, at 196.  In addition, the Supreme Court has made it clear that the determination should be individualized and "made with reference to measures … that mitigate the individual's impairment." *Sutton*, 527 U.S. at 482-83 (stating that "[a] disability exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if corrective measures were not taken"); *Murphy v. United Parcel Service, Inc*., 527 U.S. 516, 521 (1999).  Finally, a plaintiff is required to prove a disability "by offering evidence that the extent of the limitation caused by their impairment *in terms of their own experience* is substantial." *Toyota*,

534 U.S. at 198 (*internal citation omitted*) (*emphasis added*).  In other words, "[a] plaintiff cannot survive summary judgment by showing that an impairment like his own could substantially limit a major life activity … in his own future.  Rather, he must show that his impairment has actually and substantially limited the major life activity on which he relies."   *Waldrip*, 325 F.3d at 656.

Under this exacting standard, the Court finds that C.R.S. does not have allergies which substantially limit the major life activities of breathing and learning as  a matter of law.[9] Plaintiffs have shown that she suffers from allergies and asthma which require her to take medications on a daily basis and carry an EpiPen.  (Rec. Docs. 38 & 39, Exh. A).  Dr. Kidd specifically noted that "C.R.S. is to have her EpiPen … on hand at all times" and "will need to adhere to the medication regimen … indefinitely."  (*Id.*).  Plaintiffs have further demonstrated that C.R.S.'s allergies have the potential to be severe under certain circumstances.  (Rec. Docs. 38 & 39, Exh. B, pp. 13 & 27).  When asked if C.R.S. had ever had an anaphylactic reaction, Dr. Schneider stated that "[o]n January 16, 2004 she had an itchy, welty rash occur after an allergy shot … so that might indicate … there was a mild anaphylactic reaction that occurred since the

---

[9] While allergies and asthma may rise to the level of a disability, courts have frequently found that allergies and asthma are not disabilities under the ADA or the Rehabilitation Act. *See Muller v. Costello*, 187 F.3d 298 (2d Cir. 1999)(finding plaintiff who suffered from asthma which made it difficult to breath when exposed to cigarette smoke was not disabled for purposes of ADA); *Conner v. Celanese Ltd*., 2005 WL 2266622 (S.D. Tex. 2005) (unpublished) (granting a motion for summary judgment against a plaintiff with allergies and bronchitis after she failed to show that the allergies prevented her from working and earning overtime on a regular basis); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir. 1996)(noting that "a few instances of shortness of breath while climbing stairs … do not rise to the level of substantially limiting the major life activity of breathing"); *Emery v. Caravan of Dreams, Inc*., 879 F.Supp. 640 (N.D. Tex. 1995)(finding plaintiff who suffered from allergies and asthma in response to cigarette smoke was not "disabled" since it did not prevent her from working and she was learning to roller-blade); *Murphy v. Board of Educ. of Rochester City School Dist*., 273 F.Supp.2d 292 (W.D.N.Y. 2003)(finding asthmatic plaintiff not "disabled" when his symptoms were limited to certain school buildings and he was generally able to control attacks as long as there was sufficient access to fresh air); *Castro v. Local 1199, Nat'l. Health and Human Servs. Employees Union*, 964 F.Supp. 719, 724 (S.D.N.Y. 1997)(stating that "many courts addressing the issue … have found that asthma does not substantially limit the particular plaintiff's ability to work or breathe and therefore does not constitute a disability under the ADA or Rehabilitation Act"); *but see Treadwell v. Dow-United Technologies,* 970 F.Supp. 962 (M.D. Ala. 1997)(finding a genuine question of fact when individual had experienced three episodes – one in which the employee had to be put on oxygen -- within a month); *Whillock v. Delta Air Lines, Inc*., 926 F.Supp. 1555, 1561 (N.D. Ga. 1995), *aff'd*, 86 F.3d 1171 (11th Cir. 1996).

initial horse history." (*Id.*, at p. 27). Dr. Kidd likewise indicated that C.R.S. had "potential for more severe asthma and/or anaphylactic sensitivity." (Rec. Docs. 38 & 39, Exh. A).[10]

While C.R.S. could potentially have a very severe reaction under some circumstances, no such reaction has actually occurred over the course of her life. (Rec. Docs. 38 & 39, Exhs. A & C). The record indicates that she had a strong reaction in 2001, another milder one following her first allergy shot, and a third in August of 2006. (*Id.*). Moreover, no evidence indicates that these reactions substantially limited her ability to breathe when they occurred. Her most recent reaction involved only "watering eyes" and a "scratchy throat," and the "mild anaphylactic reaction" she experienced after the administration of her first allergy shot in 2003 was apparently only "an itchy, welty rash." (Rec. Docs. 38 & 39, Exhs. A-C). Even before she began receiving allergy shots from Dr. Schneider, the record is basically void of references to C.R.S.'s allergies adversely affecting her ability to breathe. (Rec. Docs. 38 & 39, Exhs. F & G).[11] Such infrequent and relatively mild occurrences do not amount to "substantial" limitations, and while C.R.S. has the "potential" to have a more serious reaction, a potential reaction does not "presently" limit her ability to breathe. *Sutton*, 527 U.S. at 482-83; *see also Waldrip*, 325 F.3d 652.

Although C.R.S.'s impairment only minimally impacts her ability to breathe, to an even lesser extent her allergies impact her ability to engage in the major life activity of learning or attending school. C.R.S.'s attendance records show that C.R.S. attends school on a regular basis. In fact, she only missed six days of school in kindergarten, seven in first grade, and four full days in second grade. (Rec. Doc. 23, Exh. O). Even attributing all of these absences to her

---

[10] According to Dr. Schneider, the difference between normal allergies and anaphylaxis is that anaphylaxis is "a more systemic response where if it involves the airway or the blood pressure could be potentially life threatening." (Rec. Docs. 38 & 39, Exh. B, p. 13).

[11] The only evidence indicating that C.R.S. had difficulty breathing is the affidavit of Mark and Penny Smith stating that C.R.S. had difficulty breathing after touching a horse in 2001 and her medical records noting that they reported that she had on and off wheezing six to eight times a year before receiving allergy shots. At the same time, the emergency room records following the horse incident in 2001 note that C.R.S. had redness and swelling but that her

allergies and asthma, C.R.S. is not "substantially" limited by so few absences.  Nor do these absences put her at risk of failing due to excessive absenteeism. (*Id.*). Plaintiffs themselves acknowledge that there is no real danger C.R.S. will fail due to excessive absenteeism. (Rec. Doc. 1, p. 8 ¶ 18).  In addition, C.R.S. also appears to be doing well academically, as she consistently earns A's and B's. (Rec. Doc. 23, Exhs. M & O).  Based on undisputed facts, C.R.S.'s impairment has not "substantially" limited her ability to learn or attend school.

(b) Record of Impairment

In order to establish the existence of a record of an impairment, an individual must show that he or she has "a history of, or [has] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 45 C.F.R. §84.3(iii); *Martinez*, 233 F.Supp.2d at 1132 (*citing Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 924 (8th Cir. 2001)).  Simply having a record of being diagnosed with an impairment is not enough, "in order to establish the existence of a "disability" … there must be a record of an impairment that substantially limits one or more of the ADA plaintiff's major life activities." *E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645, 655 (5th Cir. 1999).

In opposition, Plaintiffs submit that her medical history and the fact that she has received accommodations (including, most recently, 504 accommodations) demonstrate a "record of impairment."  Defendants in turn argue that C.R.S. does not have a record of having allergies that substantially limit a major life activity as neither Dr. Schneider nor school officials characterized her allergies as anything other than ordinary. (Rec. Doc. 23, pp. 13-14).

As previously discussed, the medical history and school records do not indicate that C.R.S. has a history of being classified or misclassified as disabled.  Her records demonstrate

---

respirations were "even and non-labored" and that her breath "sound[ed] clear." (Rec. Docs. 38 & 39, Exh. D).

that she rarely exhibited signs of an allergic reaction, regularly attended school, performed well academically, and was able to participate in most field trips and activities.  Additionally, the Court finds it notable (for the purposes of this provision at least) that in her medical records, a notation specifically indicates that she was not believed to have a disability. (Rec. Docs. 38 & 39, Exh. F, p. 13).

Nor do the accommodations the school was willing to make for C.R.S. indicate that they classified C.R.S. as disabled.  The early accommodations made for C.R.S. involved activity typically done for non-disabled students with allergies such as keeping an EpiPen in the nurse's office. (Rec. Doc. 23, Exh. O).  Further accommodations were provided only at the request of Plaintiffs and, for reasons discussed more fully below, do not demonstrate that Defendants regarded, classified, or misclassified C.R.S. as disabled.

(c) Regarded as Having an Impairment

An individual is "regarded as" disabled if he or she (1) has an impairment that is not substantially limiting but which the employer perceives as substantially limiting, (2) has an impairment that is substantially limiting only because of the attitudes of others, or (3) has no impairment but is perceived by the employer as having a substantially limiting impairment. *Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503 (5th Cir. 2003); *see also Mason*, 274 F.3d at 317 (*citing Sutton*, 527 U.S. at 489).  Based on the record currently before the Court, it is undisputed that Defendants did not regard C.R.S. as disabled and did not believe that her impairment was more limiting than it was.

Defendants were aware that C.R.S. had allergies and did make accommodations for her allergies, but "[a]wareness of the condition … is not the same thing as a belief that the condition is substantially impairing." *Cassimy v. Board of Educ. of Rockford Public Schools, Dist. #205*,

461 F.3d 932, 937 (7th Cir. 2006).  Browning's affidavit states (and Plaintiffs do not contest) that many other children with allergies attend Loranger Elementary School and are permitted to keep an EpiPen in the nurse's office.  The school did not, therefore, find anything exceptional about C.R.S. keeping an EpiPen in the office as well. (Rec. Doc. 23, Exh. O).   The record further reflects Defendants' reluctance to accord C.R.S. the extensive accommodations Plaintiffs were requesting and Defendants' view that accommodations similar to those made for non-disabled students with allergies were sufficient for C.R.S..  A note contained in C.R.S.'s medical records, for instance, states that the school nurse called to confirm that the medication instructions the school had received were accurate and to "make sure everything hand-written was done by one of [her doctors] and not the parent." (Rec. Docs. 38 & 39, Exh. F).  The letter from the Louisiana Department of Education referred to a note from Browning stating that 504 accommodations were unnecessary and that the existing accommodations would suffice. (Rec. Doc. 1, Exh. A, p. 2 ¶ 6).

In light of such evidence, it is clear that Defendants believed that C.R.S. had allergies but did not hold "exaggerated views about the seriousness of [her] illness." *Cassimy*, 461 F.3d at 937 (*citing Ogborn v. United Food and Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002)).  The Plaintiffs' belief that C.R.S. was disabled and their efforts to receive disability accommodations from Defendants are insufficient to show that Defendants likewise held such beliefs or regarded C.R.S. as disabled.  *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001)(plaintiff failed to show that her employer erroneously believed that she was substantially limed in her ability to work because "the record indisputably reveal[ed that her employer] thought the plaintiff was capable of performing her job in a smoke-free environment," nor could plaintiff establish that her employer mistakenly believed that she was substantially limited in other major life activities, such as breathing, because "the evidence show[ed], at best

that officials knew she suffered from smoke-induced asthma and migraines, but doubted her declarations pertaining to the severity of her condition"), *cert. denied*, 535 U.S. 933 (2002); *see also Kelly v. Drexel University*, 94 F.3d 102, 109 (3d Cir. 1996); *Murphy*, 273 F.Supp.2d at 320, note 24 (finding plaintiff was not regarded as disabled under ADA because record showed that although the employer accommodated plaintiff, the employer "tended to doubt the credibility of his complaints").

### 2.        Discrimination Under the ADA and the Rehabilitation Act

As set out above, the Rehabilitation Act and the ADA prohibit covered entities from discriminating against a qualified individual with a disability, excluding such an individual from participation in, or denying the individual the benefits of, any of the entity's services, programs, or activities. 42 U.S.C.A § 12132.  In conjunction with these requirements, both acts require covered entities to provide reasonable accommodations to individuals with disabilities.  Under the Rehabilitation Act, reasonable accommodations may be required when a student with a disability is denied meaningful access to a benefit, *see Alexander v. Choate*, 469 U.S. 287, 301-02 (1985), while the ADA regulations require reasonable modifications in policies when necessary to avoid discrimination on the basis of a disability. 28 C.F.R. § 35.130(b)(7); *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987).[12]  The Supreme Court has made it clear that an academic institution's obligation to make modifications does not mean that the institution must make fundamental or substantial changes to its programs or standards. *Alexander*, 469 U.S. at 301-02.  Nor is a school required to perfectly adhere to a parent's wishes in establishing or executing a 504 accommodation plan.  *See generally* 34 C.F.R. 104.34-104.37;

---

[12] "Reasonable modification as used in the ADA does not create a different standard than "reasonable accommodation" used in the Rehabilitation Act. *See Wong*, 192 F.3d at 816; *Theriault v. Flynn*, 162 F.3d 46, 48 n. 3

*see also K.U. v. Alvin Independent School Dist.*, 991 F.Supp. 599 (S.D. Tex. 1998)(noting that "perfect accordance with parents' wishes is not a requirement of Section 504").  Nevertheless, "[t]he educational institution has a 'real obligation … to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation.'" *Wong v. Regents of University of California*, 192 F.3d 807, 817 (9th Cir. 1999)(*quoting Wynne v. Tufts University School of Medicine*, 932 F.2d 19, 25-26 (1st Cir. 1991)).  Included in this duty is an obligation to "gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary to enable [the individual to meet the standards in question]." *Wong*, at 818 (*quoting Buckingham v. U.S.*, 998 F.2d 735, 740 (9th Cir. 1993)).

Plaintiffs allege that Defendants discriminated against C.R.S. by failing to excuse her for absences related to her impairment and by failing to adhere to numerous provisions of the 504 accommodation plan which are medically necessary for her to safely participate in a number of school activities.  In response, Defendants argue that they have counted absences related to her impairment as excused absences and have not threatened to fail C.R.S. for excessive absenteeism. (Rec. Doc. 46, Exh. C).  In addition, they assert that they have made reasonable accommodations and that the additional demands requested by Plaintiffs are unnecessary and unreasonable.  Specifically, Defendants point out that they have and will continue to administer C.R.S.'s medication, keep an EpiPen for C.R.S. in the nurse's office, train their staff regarding anaphylaxis, provide disability sensitivity and FERPA training, contact the Smiths if C.R.S. seems ill, an EpiPen is expired, a school field trip may involve horses, etc., and permit her to

_____

(1st Cir. 1998).

stay inside, at-home, or to watch from a safe distance in the event a horse is brought to campus. (Rec. Doc. 46, Exh. E).

In this case, the undisputed facts indicate that Defendants did not discriminate against C.R.S. by counting absences related to her impairment against her or by threatening to fail her because of such absences.  It appears that the "threat" at issue is a form letter that the school is required to send to parents when their child has missed a certain number of days. (Rec. Doc. 46, Exh. F; Rec. Doc. 23, Exh. M).  Moreover, attendance records for C.R.S. indicate that absences due to her medical condition were treated as excused absences and were not used to threaten her with failure.  Her attendance record further reveals that she was not, in fact, in danger of failing. (Rec. Doc. 23, Exhs. M & O).  Finally, Plaintiffs acknowledge that they were assured by Joseph that C.R.S. would not be failed for excessive absenteeism. (Rec. Doc. 1, p. 8 ¶ 18).

The record further supports Defendants' assertion that it is currently reasonably accommodating C.R.S. and that the additional accommodations requested by Plaintiffs are unnecessary and impractical.  The only recommendations suggested by Dr. Schneider and/or Dr. Kidd as medically necessary include informing persons directly responsible for or likely to come into contact with C.R.S. of her condition and the possibility of her having a life-threatening reaction and making sure that C.R.S. takes certain medications on a daily basis, carries around or has ready access to an EpiPen, and avoids contact with potential allergens "as well as possible."[13]  (Rec. Docs. 38 & 39, Exh. A).  As previously mentioned, it is undisputed that the school complies with all of these recommendations.

In addition to supporting the reasonableness of Defendants' current accommodations, the record indisputably shows that the additional accommodations requested by Plaintiffs are

---

[13] The efficacy and reasonableness of these accommodations is further evidenced by the fact C.R.S. went years without having a reaction at school with only these accommodations in place.  Moreover, other students with similar

unnecessary and unreasonable.  When Dr. Schneider was asked in deposition if it was medically

necessary to ban horses from campus, wipe off equipment, and spray the street down with water

or bleach, he unequivocally answered no. (Rec. Docs. 38 & 39, Exh. B, p. 54).  Dr. Schneider

also stated that he did not consider it necessary or feasible to completely ban horses or horse

equipment from campus. (Rec. Docs. 38 & 39, Exh. B, p. 56).

Beyond referring to Dr. Schneider's opinion that the requested accommodations are not

necessary or, in some cases, feasible, Defendants further substantiate the impracticality of

Plaintiffs' requests by citing their experience implementing the additional provisions. *See*

*Buckingham*, 998 F.2d at 740 (noting that an education institution's findings as to whether an

accommodation is reasonable will be accorded deference so long as the institution has done

some investigation and is not "merely speculating that a suggested accommodation is not

feasible").  In her affidavit, for example, Browning states that in an effort to enforce the campus-

wide ban on horses, she "called a deputy in to help and personally stood in the roadway to

attempt to stop the horses from proceeding," but that "[t]he parents refused to stop and

proceeded down the road, and the deputy had to pull [Browning] out of the way." (Rec. Doc. 23,

Exh. O).  As previously noted, Defendants' efforts at washing down the road after a horse passed

proved more difficult after the Loranger fire department eventually refused to assist. (Rec. Doc.

23, Exh. L).

### 3.        Retaliation Under the ADA and the Rehabilitation Act

Regardless of whether a party is ultimately successful in their underlying case, a plaintiff

may nevertheless pursue a retaliation claim under the ADA and the Rehabilitation Act. 42 U.S.C.

---

allergy problems require and receive virtually identical accommodations (including EpiPens, staff training, etc.).
(Rec. Doc. 23, Exh. O).

§ 12203 (prohibiting interference with any individual on account of having aided any person in the exercise of a protected right); 28 C.F.R. § 42.503(b)(1)(vii)(making it unlawful to intimidate or retaliate "for the purposes of interfering with any right"); *Krouse v. American Sterilizer Co*., 126 F.3d 494, 502 (3d Cir. 1997).  When a retaliation claim is based on circumstantial evidence, as it is here, plaintiffs must establish a *prima facie* case of retaliation by demonstrating (1) that the plaintiff engaged in protected activity, (2) that an adverse action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Baker v. American Airlines, Inc*. 430 F.3d 750, 754 (5th Cir. 2005); *see also Fierros v. Texas Dept. of Health*, 273 F.3d 187 (5th Cir. 2001); *Sherrod v. American Airlines*, 132 F.3d 1112 at 1122 (5th Cir. 1998). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "state a legitimate, non-retaliatory reason for its action." *Baker*, 430 F.3d at 755(*citing Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005)).

Plaintiffs submit that their attempts to secure educational accommodations for C.R.S. were protected activities and that these efforts resulted in Defendants threatening all three of their children.  As previously indicated, they allege that that the defendants threatened to fail C.R.S. because of excessive absenteeism, but they also allege that J.S.'s cheerleading skirt was touched and/or lifted up and her position on the cheerleading team threatened and that C.S. was denied special education by Defendants.  In addition, Plaintiffs allege that the "community and school" was "incit[ed]" against Plaintiffs, ultimately resulting in verbal threats against Plaintiffs and vandalism to Plaintiffs' home . (Rec. Doc. 1; Rec. Doc. 39).

In this case, it is undisputed that Plaintiffs engaged in protected activity by attempting to secure accommodations for C.R.S. under the ADA and Section 504. *See Weixel v. Board of Ed*., 287 F.3d 138, 149 (2d Cir. 2002); *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (retaliation claim can be based on request for accommodations).  Defendants deny that Plaintiffs

have demonstrated any sufficiently "adverse" acts attributable to Defendants and suggest that Plaintiffs have failed to establish a causal connection between the allegedly retaliatory acts and Plaintiffs' protected activity. (Rec. Doc. 46).

The Court's research did not reveal a particular test for what constitutes an "adverse action" in the context of an education claim.  Nevertheless, guidance comes from cases involving employment discrimination, education cases in which a particular action was found sufficiently adverse, and decisions rendered by the Office for Civil Rights (the agency within the United States Department of Education responsible for due process hearings)  An adverse action to be such should "materially" affect the student as to his or her status or should be sufficiently severe so as to deter a reasonable individual's advocacy efforts.[14]

With regard to the first allegedly adverse action -- threatening to fail C.R.S. for excessive absenteeism -- the "threat" the Plaintiffs received appears to have been a form letter informing Plaintiffs of their daughter's attendance record.  As the school has a valid policy for sending out such letters and did not appear to deviate from the policy in this case, it is not an adverse action. *Salem (NH) School District*, April 16, 2001 35 IDELR 260 (OCR found no adverse action where alleged action was simply the school executing a valid policy).  Even assuming a threat beyond the form letter, the attendance records make it clear that the threats did not actually result in any adverse action.  Any health-related absences C.R.S. had were treated as excused absences and

---

[14] When discussed in the employment context, for instance, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Rv. v. White*, --- U.S. ----, 126 S.Ct. 2405, 2415 (2006).  An action is usually found materially adverse if it is an ultimate employment action (directly affecting the employee's status) or otherwise meets some level of "substantiality." *Webb v. Cardiothoracic Surgery Assoc.*, 139 F.3d 532, 540 (5th Cir. 1998); *Stavropoulos v. Firestone*, 361 F.3d 610 (11th Cir. 2004).

Without expressly setting out a standard, some education decisions similarly indicate that an "adverse action" should be sufficiently serious to significantly impact a student's status.  *See Mershon v. St. Louisa Univ.*, 442 F.3d 1069 (8th Cir. 2006)(finding student being banned from campus sufficiently adverse, though ultimately ruling that the University had a valid non-discriminatory reason); *Amir v St. Louis Univ.*, 184 F3d 1017 (8th Cir. 1999)(finding student failing out of program sufficiently adverse to support a retaliation claim); *San Ramon Valley (Cal.) Unified School District*, 38 IDELR 73 (OCR 2002).

she was not actually at risk of failing. (Rec. Doc. 23, Exhs. M & O).  In addition, Plaintiffs knew

that C.R.S. was not at risk of failure and had, in fact, been assured that she would not fail for

excessive absenteeism. (Rec. Doc. 1, p. 8 ¶ 18).

A threat that is unlikely to occur and does not actually occur is not an adverse action as it

does not significantly disadvantage a student as to their status and is unlikely to deter advocacy

efforts.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000)(refusing to find an

adverse action when employee did not actually have to follow a proposed schedule that would

have been difficult with the employee's disability); *Dobbs-Weinstein v. Vanderbilt Univ*., 185

F.3d 542, 543-46 (6th Cir. 1999)(finding a denial of tenure decision that was reversed and had

no effect on the employee's status was not an adverse action); *Robinson v. City of Pittsburgh*,

120 F.3d 1286, 1300 (3d Cir. 1997).

Plaintiffs' claims regarding retaliatory acts against J.S. are also insufficiently adverse.

Looking beyond the minor nature of the alleged conduct, Defendant Fairburn has specifically

denied touching or lifting J.S.'s skirt and has set forth an alternate explanation with specific

details (she was attending a game and overheard J.S. say that another person had touched her

skirt) which Plaintiffs have neither denied nor subsequently discussed. (Rec. Doc. 30, Exh. B).

Moreover, no evidence has been presented that J.S's position as a  student or cheerleader was

actually affected or reasonably likely to be affected.

Plaintiffs allege that they were forced to withdraw C.S. from speech therapy because Defendants did not assign C.S. the speech therapist "to whom he had become accustomed." (Rec. Doc. 1, p. 10, ¶ 25).  While the act of denying special education allegedly taken against C.S. may affect his status as a student, Plaintiffs are unable to show that their decision to withdraw C.S. from speech therapy was an adverse action or the result of an adverse action *by Defendants*.  As previously mentioned, schools are not required to adhere to a parent's every demand so long as their decision is reasonable, *K.U. v. Alvin Indep. Sch. Dist*., 991 F.Supp. 599 (S.D. Tex. 1998); *see also Dreher v. Amphitheater Unified School Dist.,* 22 F.3d 228 (9th Cir. 1994), and Plaintiffs have not shown that the school acted improperly or unreasonably in choosing a different speech therapist.[15]  Instead, Plaintiffs have shown only that they did not agree with the school's decision and chose to withdraw C.S. from speech therapy.  The school's refusal to adhere to all of Plaintiffs' demands, without more, does not constitute an adverse action.

Even assuming Defendants had acted adversely by assigning C.S. a different speech therapist, no causal connection between that action and Plaintiffs' request for accommodations for C.R.S. is possible. While a plaintiff may establish a causal link by showing temporal proximity and knowledge of the complaint or request, *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001), Plaintiffs have failed to demonstrate any such temporal proximity.  C.S. was

---

[15] As Plaintiffs' claim regarding C.S. falls under IDEA and, therefore, requires that administrative remedies are exhausted or otherwise shown to be futile before it can be brought before a District Court, this Court does not address the school's decision. *Babicz*, 135 F.3d 1420 (finding that "claims asserted under Section 504 and/or the ADA are subject to Section 1415(f)'s requirement that litigants exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under Section 504 and/or the ADA"); *Frazier*, 276 F.3d at 59.

withdrawn from speech therapy in February of 2001, well before any dispute over accommodations for C.R.S. and years before Plaintiffs formally requested 504 accommodations for C.R.S. (Rec. Doc. 46, Exh. D).  Adverse acts that precede the request for accommodations are not causally related to the request. *St. Hilaire v. Minco Products, Inc*., 288 F.Supp.2d 999, 1007-08 (D. Minn. 2003).

Although the verbal threats and damage to Plaintiffs' property could be sufficiently severe as to constitute "adverse acts" if they would arguably deter a reasonable person from engaging in advocacy efforts, they are not acts taken by or attributable to Defendants or Fairburn.  Plaintiffs never argue that Defendants were involved in the particular acts at issue, including an alleged confrontation that occurred in the parking lot at Loranger Elementary School which caused Mr. Smith to fear for his safety, the Smith's home being vandalized in May 2005, and a group of citizens in a car yelling "horse hater" at Mr. Smith. (Rec. Doc. 1, pp.19-20 ¶ 50).  Instead, Plaintiffs attempt to attribute these acts to Defendants and Fairburn based on the distribution of the flyer which, Plaintiffs claim, riled the community and encouraged retaliatory acts against Plaintiffs.

Plaintiffs present no proof that any of the Defendants discussed, leaked, or let it be known that Plaintiffs did not want horses brought on campus because of C.R.S.'s allergies.  Even though temporally this occurred closely after Plaintiffs formally requested 504 accommodations and the acts demonstrated that the private citizens involved were aware of the ongoing dispute, it is equally plausible that this information could have been communicated by Plaintiffs or through children.  In any event, however, no proof was presented that Defendants asked or actively encouraged members of the community to ostracize Plaintiffs, or that Defendants acted in conjunction with Fairburn.

Even assuming, for present purposes, that both Defendants and Fairburn are responsible for the flyer, the information contained in the flyer is not an adverse act or an attempt to incite adverse action. *San Ramon Valley (Cal.) Unified School District*, 38 IDELR 73 (OCR 2002)(OCR found that no adverse action occurred when a coach allegedly discouraged a student-athlete from associating with the student because of the parent's advocacy efforts because this act did not actually disadvantage the students status and did not substantially discourage advocacy efforts).  The flyer did not adversely affect the status of C.R.S. as a student and did not incite people to do anything directly or indirectly to C.R.S. or Plaintiffs.  Contrary to the Plaintiffs' characterization, the flyer asked only that people contact Browning and Members of the Board to voice their support for permitting Browning and the vice-principal to ride horses to campus on March 24. (Rec. Doc. 30, Exh. A). The flyer also did not entirely oppose Plaintiffs' advocacy efforts and even acknowledged that a child should receive *reasonable* accommodations because of his or her allergies.[16]  Even if the flyer criticized Plaintiffs for making unreasonable demands, that criticism is not the same as encouraging people to verbally or otherwise attack Plaintiffs and, in and of itself, such criticism is not an adverse act.[17]

---

[16] The flyer states, in relevant part: "I'm very sorry that her child's life could be in danger IF a horse hair touches her.  However, I find it very difficult to believe that she wouldn't just make a good choice for HER CHILD, and keep her home or let her watch from a window … ALL STUDENTS ARE UNIQUE AND HAVE DIFFERENT SITUATIONS (like being allergic to bees, wasps, ants, and latex ; some have had tracheotomies; some are even allergic to light), but we SHOULD NOT TREAT THEM ANY DIFFERENTLY; however, we can help them adjust and enjoy any/everything by simply putting them in a place/situation where they will be safe and STILL ENJOY BEING A PART OF THE LES FAMILY OF FUN!" (Rec. Doc. 30, Exh. A).

[17] In the employment sector, courts have generally taken the approach that criticism of an employee's job performance -- justified or not – which does not materially affect the individual's employment is not permissible grounds for a retaliation suit. *Davis v. Town of Lake Park, Fla.*,245 F.3d 1232 (11th Cir. 2001)(noting that criticism of an employees performance that has no tangible impact on the terms, conditions or privileges of employment is not an adverse action even though it may adversely affect the employee's self-esteem and/or prestige in the eyes of others who come to be aware of the evaluation); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)(counseling memoranda and "negative performance evaluations, standing alone, cannot constitute an adverse employment action"); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994)(allegedly unjustified negative performance evaluation not actionable); *St. Hilaire v. Minco Products, Inc.*, 288 F.Supp.2d at 1006 (finding co-worker's comments that plaintiff was "weird," "retarded," "a baby," "immature," "a whiner," "a thorn in [co-worker's] thigh," and "a pain in the ass" did not create a hostile environment or unduly affect plaintiffs job performance to support action under the ADA).

In addition, the evidence currently before the Court indicates that the school tried to dispel some of the tension between Plaintiffs and members of the community and that some members of the community may have engaged in discriminatory conduct due to unprotected acts by Plaintiffs.  By affidavit, Browning has stated that she actively tried to dispel tension by not naming C.R.S. (notwithstanding Plaintiffs' request that they specifically name her) in a letter they sent home indicating that "one or more students" had horse allergies, and by refusing to send subsequent letters out to avoid drawing further attention to the conflict. (Rec. Doc. 23, Exh. I; Rec. Doc. 46, Exh. C).  Browning also indicated that the confrontation between Mr. Smith and another parent in the parking lot may have been partially due to the fact Mr. Smith was videotaping parents dropping off their kids at school, which is not protected activity as it violates school policy.  (Rec. Doc. 46, Exh. C).  Mr. Smith's actions apparently resulted in Browning receiving a number of complaints from parents, which then required further ameliorative efforts on the part of Browning. (*Id.*).

Based on the undisputed evidence presented, the Court finds that Plaintiffs have failed to establish a case of retaliation as a matter of law.  "[M]inor annoyances do not make a federal case." *Doe v. SEPTA*, 72 F.3d 1133, 1137 (3d Cir. 1995).  Plaintiffs present no proof that Defendants and Fairburn actively sought or attempted to incite the more serious acts committed by members of the community.  In fact, the evidence indicates otherwise.  Defendants are not liable for actions not caused by them.

.

## B.  Civil Rights Claims[18]

In addition to raising claims under the ADA and the Rehabilitation Act, Plaintiffs alleged

pursuant to 42 U.S.C. § 1985 that Defendants and Fairburn engaged in a conspiracy to deprive

them of their rights under the ADA and the Rehabilitation Act and their constitutional rights to

free speech and due process. At the outset, this Court notes that insofar as Plaintiffs have failed

to show a violation of the ADA and the Rehabilitation Act, they cannot pursue a Section 1985

claim based on a violation of their rights under these statutes.  *Copsey v. Swearingen*, 36 F.3d

1336, 1346 (5th Cir. 1994); *DeBord v. Board of Educ. of Ferguson-Florissant School Dist.*, 126

F.3d 1102, 1106-07 (8th Cir. 1997).  Out of an abundance of caution and inasmuch as Plaintiffs

have also asserted violations of their free speech and due process rights, this Court will

nevertheless consider Plaintiffs' conspiracy claim.

Conspiracies to violate constitutional rights are cognizable under both 42 U.S.C. § 1983

and 42 U.S.C. § 1985.[19] *Crowe v. Lucas*, 595 F.2d 985 (5th Cir. 1979).  In this case, Plaintiffs

seek redress only under Section 1985, presumably Section 1985(3).[20]  In order to sustain a cause

of action under Section 1985(3), a plaintiff must allege that "two or more persons conspired to

---

[18] The Court discusses the Civil Rights claims only in regard to Fairburn as Defendants do not address this claim in their Motion for Summary Judgment or in any of their subsequent briefs.

[19] 42 U.S.C. § 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

Similarly, 42 U.S.C. § 1985(3) states:

> If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws … or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

directly, or indirectly, deprive him of the equal protection of the laws or equal privileges and immunities under the laws." *Newsome v. E.E.O.C.*, 310 F.3d 227, 232 (5th Cir. 2002)(*quoting Green v. State Bar of Texas*, 27 F.3d 1083, 1089 (5th Cir. 1994).  In addition, a Section 1985(3) claim requires that the plaintiff allege discrimination on the basis of "some racial or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin*, 403 U.S. 88, 102 (1971); *Bryan v. City of Madison, Miss*., 213 F.3d 267, 276 (5th Cir. 2000); *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261 (5th Cir. 2001); *Newberry v. East Texas State University*,161 F.3d 276, 281 (5th Cir. 1998).

Fairburn argues that Plaintiffs have failed to present sufficient facts to support the existence of a conspiracy to deprive Plaintiffs of their civil or constitutional rights for purposes of summary judgment.  According to Plaintiffs, the circumstances surrounding the distribution of the flyer – namely, the fact it was distributed so soon after Plaintiffs requested accommodations and attempted to prevent Browning from riding a horse to school and the intimate knowledge displayed in the flyer – sufficiently demonstrate the existence of a conspiracy or at least, raise a question of fact as to the existence of a conspiracy. (Rec. Doc. 49, p.10).

The Court finds the Plaintiffs' Section 1985 claim untenable as they have insufficiently demonstrated that Fairburn acted in accordance with a mutual understanding with another person.  Even assuming Plaintiffs were able to demonstrate that requirement, they cannot demonstrate that Fairburn conspired to deprive them of their rights under the aforementioned disability statutes, under the U.S. Constitution, or for some otherwise illegal purpose.[21]   In so

---

[20] Plaintiffs' complaint specifically cites to 42 U.S.C. § 1985 without mentioning Section 1983 and in Plaintiffs' Memorandum Regarding Subject Matter Jurisdiction, Plaintiffs only refer to Section 1985.  (Rec. Docs. 1 & 50).
[21] In addition, the Court notes that Plaintiffs have failed to allege discrimination on the basis of some class-based animus.  It is unclear if the Fifth Circuit recognizes Section 1985 actions on the basis of a non-racially motivated animus.  *Newberry,* 161 F.3d at 281.  In addition, when alleging a class-based animus, the plaintiffs must show that the defendants discriminate against disabled people as a class. *Id*., at 281; *see also Burns-Toole v. Byrne*, 11 F.3d 1270 (5th Cir. 1994)(finding plaintiff could not support a conspiracy claim when she alleged "she was discriminated

finding, the Court is mindful that circumstantial evidence may be used to prove the existence of a conspiracy because "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." *Crowe*, 595 F.2d at 93.  It is not enough, however, for plaintiffs to show that defendants merely acted in concert or with a common goal; there must be evidence that defendants "directed themselves towards an unconstitutional action by virtue of a mutual understanding." *Todd v. City of Natchitoches*, 238 F.Supp.2d 793 (W.D.La. 2002); *see also Crowe*, 595 F.2d at 93(noting that conspiracy claims require that a "plaintiff must show that defendants agreed to commit an illegal act").

The fact that the flyer reflects that Fairburn had some knowledge of the Plaintiffs' dispute does not prove that she and Defendants engaged in some kind of agreement to prevent Plaintiffs from protesting Browning and the vice-principal's decision to ride horses to school.  Given that Loranger is a small community and that there are equally-plausible explanations for how Fairburn and other members of the community learned of the dispute, including the possibility that the Plaintiffs or children in the school disseminated the information, the fact Fairburn had knowledge of the dispute is not sufficient to demonstrate the existence of a conspiracy.  This is particularly compelling in light of Fairburn's affidavit stating that she acted alone. (Rec. Doc. 30, Ex. B).

Even assuming that Plaintiffs have put forth sufficient facts to create a question of material fact as to whether a conspiracy existed, Plaintiffs' argument ultimately fails because they cannot show that Defendants and Fairburn had any illegal or unconstitutional purpose.  At most, Plaintiffs conspired to rally support for Browning to ride horses to school on one day to motivate the student body.  Just as this aim does not give rise to a sufficiently adverse act, it does

---

against because she [was] a Seventh Day Adventist" but failed  "to present any evidence to support the proposition that the defendants discriminate against Seventh Day Adventists as a class").

not give rise to a claim based on a conspiracy to deprive an individual of his or her rights.

Accordingly, summary judgment as to Plaintiffs' 42 U.S.C. § 1985 cause of action is

appropriate.

### C.  State Law Claims

#### 1.      False Light Invasion of Privacy[22]

Although Fairburn initially construed Plaintiffs' invasion of privacy argument as a

defamation claim, upon clarification it was established that Plaintiffs are alleging a "false light"

invasion of privacy cause of action against Fairburn for making and distributing her flyer.  Under

Louisiana law, a cause of action for "false light" invasion of privacy arises from "publicity

which unreasonably places the plaintiff in a false light before the public."  *Simpson v. Perry*, 887

So.2d 14, 16 (La. App. 1st Cir 2004); *Perere v. Louisiana Television Broad. Corp.*, 812 So.2d

673 (La. App. 1st Cir. 1998).  While the publicity is not required to be defamatory in nature and

there need not be any malicious intent on the part of the defendant, the publicity must be

"objectionable to a reasonable person under the circumstances and must contain either falsity or

fiction."  *Id.*, *citing Smith v. Arkansas Louisiana Gas Company*, 645 So.2d 785, 790, *writ denied*,

650 So.2d 1179 (La. 1995).  When analyzing a claim for a false light invasion of privacy, the

Court considers three elements: privacy interest, falsity, and unreasonable conduct.  *Perere*, 812

So.2d at 676.

In her motion, Fairburn argues that the flyer did not contain any false information. (Rec.

Doc. 49).  Plaintiffs, in turn, argue that the falsity at issue "is the representation that the Smiths

somehow delight in removing horses from the parade, or that they have asserted this claim

---

[22] As was true of the Civil Rights claims, only Fairburn raised arguments regarding the false light invasion of privacy claim.  The Court's discussion and subsequent ruling is, therefore, applicable to Fairburn alone.

without regard for the children of the community." (Rec. Doc. 1, p. 19; Rec. Doc. 38, p. 10). In addition, they claim that the language of the flyer is inflammatory and that the circumstances surrounding its distribution make it objectionable to an average reasonable individual. A careful reading of the flyer indicates that it was not untrue nor unsympathetic to Plaintiffs, or "objectionable to a reasonable person." Thus, Plaintiffs cause of action fails because it does not establish that the publication contained a falsity as a matter of law.

Looking at the alleged falsity, Plaintiffs are not actually arguing that the flyer contained inaccurate information but merely that it portrayed Plaintiffs in an unflattering light. "More than insensitivity or simple carelessness is required for the imposition of liability for damages when the publication is truthful, accurate and non-malicious." *Stern v. Doe*, 806 So.2d 98 (La. App. 4th Cir. 2001)(*quoting Roshto v. Hebert*, 439 So.2d 428, 430 (La. 1983)). While parts of the flyer suggested that Plaintiffs were acting unreasonably by pursuing a ban on horses when alternatives were available, it did not portray Plaintiffs as engaging in a thoughtless attack on a parent's right to bring horses to school or as reveling in depriving students and parents of the opportunity to have horses on campus. Fairburn specifically acknowledged that Plaintiffs were acting out of love and concern for their child, but expressed the view that, regardless of Plaintiffs' motivation, Plaintiffs' actions could result in a ban on horses. Nothing in this characterization of the situation is untrue, particularly given that Plaintiffs were, in fact, trying to institute a ban on horses. Because this Court finds that the publicity at issue does not contain a falsity, summary judgment as to this claim is appropriate.

# V.  CONCLUSION[23]

---

[23] Neither Defendants nor Fairburn addressed Plaintiffs' claim for intentional and/or negligent infliction of emotional distress. Those claims remain pending.

Based on the foregoing, the following is ORDERED:

    (1) Defendants' Motion for Summary Judgment as to Plaintiffs' Rehabilitation Act and ADA claim is hereby GRANTED;

    (2) Fairburn's Motion for Summary Judgment as to Plaintiffs' Conspiracy claim under 42 U.S.C. § 1985 and False Light Invasion of Privacy is hereby GRANTED;

    (3) Defendants' Motion for Rule 11 Sanctions is hereby DISMISSED as premature.

The parties are urged to pursue amicable resolution of this matter.

New Orleans, Louisiana, this 22nd day of November, 2006.

Helen G. Berrigan
United States District Judge